**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SHONNA COLEMAN, on behalf of herself and all others similarly situated,<br><br><br>Plaintiff,<br>v.<br><br><br>Capital One Financial Corporation, Wikibuy LLC, and Wikibuy Holdings LLC,<br><br>Defendants. | Case No.: 1:25-cv-60<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shonna Coleman, on behalf of herself and all others similarly situated, alleges as follows:

**INTRODUCTION**

1.      Capital One Shopping is a free browser extension widely used by consumers. The extension allegedly automatically looks for coupons, offers users a price comparison tools, and incorporates a built-in rewards point system wherein points can be redeemed for gift cards.

2.      Capital One Shopping's purported ability to quickly price check a product before a consumer makes an online purchase is what attracts consumers to the browser extension—it allows them to effortlessly look for a discount on a product that they are already interested in purchasing and have already added to their online shopping cart.

3.      Capital One Shopping can be used on desktop and laptop computers, and it can also be used on mobile devices (phones and tablets) by downloading the Capital One Shopping browser extension from the Apple App Store or Google Play Store.

4.      An estimated 10 million people in the United States use the Capital One Shopping browser extension.

5.      Content creators, including YouTubers and other online influencers, direct their followers and viewers to specific products and services and earn sales commissions when consumers purchase the products and services that the content creators are promoting.

6.      Online retailers (or "eCommerce merchants") work with these content creators through affiliate marketing programs, which rely on tracking tags and affiliate marketing cookies to determine who gets credit for online referrals and product sales.

7.      The content creator is given a specific web link from the online retailer to share with their audience, and if someone clicks on that link immediately prior to making a purchase, the content creator's unique affiliate marketing cookie auto-populates and credits the content creator with the sale. This is referred to as "last click attribution."

8.      Capital One Shopping is causing content creators to lose out on commissions to which they are entitled during the online checkout process.

9.      Plaintiff and class members are such content creators.

10.     Capital One programmed the Capital One Shopping browser extension to systematically appropriate commissions that belong to Plaintiff and class members. This is done by Capital One Shopping substituting its own affiliate marketing cookie in place of the content creator's affiliate marketing cookie, even when the online shopper had used the content creator's specific affiliate web link to navigate to the purchase page.

11.     Plaintiff and the class are content creators whose commission payments Capital One Shopping has wrongfully collected. Plaintiff brings this case on her own behalf and on behalf of all others similarly situated to recover the damages that they have sustained and enjoin Capital One Shopping's wrongful conduct going forward.

## JURISDICTION

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member (including Plaintiff) is of diverse citizenship from Capital One, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

13.     This Court has personal jurisdiction over Capital One because Capital One has its principal headquarters in McLean, Virginia, does business in Virginia, directly or through agents, and has sufficient minimum contacts with Virginia such that it has intentionally availed itself of the laws of the United States and Virginia.

14.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2), because a substantial number of the events or omissions giving rise to the claims arose in this District, where Capital One is headquartered and conducts business.

## PARTIES

**A.    Plaintiff**

15.     Shonna Coleman is a resident of Nebraska.

**B.    Defendants**

16.     Capital One Financial Corporation is a corporation organized and existing under the laws of Delaware.

17.     Capital One Financial Corporation holds all assets and liabilities of Wikibuy, LLC and Wikibuy Holdings, LLC, two subsidiary corporations organized and existing under the laws of Delaware that originally developed the Capital One Shopping browser extension.

18.     Capital One Financial Corporation, Wikibuy LLC, and Wikibuy Holdings, LLC are collectively referred to here as "Capital One."

19.     Capital One transacts business and is headquartered within this judicial district, specifically at 1680 Capital One Dr. in McLean, Virginia. Defendant Capital One Holdings, Inc., is a corporation incorporated in Delaware. It holds all assets and liabilities of Defendant Capital One, Inc., a subsidiary corporation also incorporated in Delaware. When referred to together herein, they are collectively "Capital One."

20.     Capital One owns and operates Capital One Shopping Science Corporation, which originally developed the Capital One Shopping browser extension. Unless otherwise noted herein, the term "Capital One" includes Capital One Shopping.

**RELEVANT FACTS**

**A.    Defendants' Methods of Appropriating Commissions**

21.    Capital One acquired a cashback rewards startup and browser extension called "Wikibuy" for an undisclosed amount in 2018.

22.    Since then, the tool has been rebranded and now operates under the name Capital One Shopping, which is controlled by Capital One.

23.    Capital One persuades consumers to download the Capital One Shopping browser extension by promising the extension will comb the internet for coupons that can be applied to items that are already in those consumers' online shopping carts, thereby saving the consumer money.

24.    The Capital One Shopping browser extension engages in near-instantaneous web scraping to search for and test coupon codes that might be applicable to the relevant purchase.

25.    Importantly, the Capital One Shopping browser extension is not limited to Capital One's base of credit card account holders and other account holders. Rather, it is widely advertised by Capital One, which lists Capital One Shopping as one of its sources of non-interest income.

26.    According to Capital One's Annual Report for 2023, the company earned $7.5 billion in non-interest income, include income from Capital One Shopping.[1]

27.    With the rise of social media and increasing popularity of platforms like YouTube, eCommerce retailers have turned to content creators (which includes but is not limited to YouTubers, influencers, bloggers, and reviewers) to market their products to consumers.

28.    Content creators make commissions by directing their audience to affiliate links.

29.    Affiliate links are unique hyperlinks that direct consumers to a given website where they can purchase the product or service being promoted by a content creator.

30.    eCommerce merchants use tracking tags to determine whether a consumer landed on the webpage for their product or service and made a purchase after clicking an affiliate link.

---

[1] *See* Capital One's Annual Report for 2023, pp. 57 (https://ir-capitalone.gcs-web.com/static-files/3381e479-cf44-4a85-a0f6-b7d8d30c2a31)(last accessed Jan. 2, 2025).

These retailers can then attribute the sale to the content creator responsible for the affiliate link and pay a commission to that content creator.

31.     When a consumer clicks on a content creator's affiliate link, a tracking tag is appended to the URL, allowing the eCommerce merchant to know whom to credit with the referral and commission for the sale.

32.     The tracking tag is saved on the consumer's browser in the form of a cookie.

33.     When it comes to online referral commissions from affiliate marketing links, the industry standard used for crediting sales is "last-click attribution," which means that the last "click" determines who gets credit for, and paid a commission on, a sale.

34.     The Capital One Shopping browser extension is designed to exploit the last-click attribution process in that it purposefully supplants content creators' cookies. The Capital One Shopping browser extension does this by producing pop-ups that simulate referral clicks—the click that would normally come from clicking on a content creator's affiliate link.

35.     Capital One has been using the Capital One Shopping browser extension to manipulate network transmissions to allow Capital One to surreptitiously take credit for sales commissions that it did not earn.

36.     Capital One Shopping displaces tracking tags that identify specific content creators as the source of the referral, substitutes its own tracking tags, and holds itself out as the referrer of the specific products and/or services, even though the sale in question was the direct result of the content creator's affiliate marketing link.

37.     Analysis of network traffic on websites where the Capital One Shopping extension was running reveals electronic transmissions and communications between a consumer's browser, the website, and other third parties. Network traffic is typically invisible to ordinary website users.

38.     The network traffic demonstrates that, when a consumer has downloaded the Capital One Shopping browser extension, Capital One Shopping silently and invisibly removes affiliate cookies and tracking tags that would otherwise credit the rightful salesperson—the content creator—with the sale of that particular product or service.

39.     The images below illustrate what happens when a consumer wants to purchase a product or service a specific content creator is promoting by clicking on that content creator's affiliate link and proceeding to the eCommerce merchant's website to complete the checkout. Importantly, whether the content creator will be credited with the referral and commission ultimately depends on whether the consumer has activated the Capital One Shopping browser extension.



*Figure 1: The screenshot was taken during the checkout process at greenmangaming.com after having navigated to the website from the online marketer's affiliate marketing link.*

40.     Figure 1 shows the eCommerce merchant's website markup (left), which is what ordinary website visitors see, and the inspection panel (right) provides a glimpse into what is happening behind the scenes prior to activating the Capital One Shopping browser extension.

41.     In Figure 1, the consumer navigated to greenmangaming.com, which was being promoted by a content creator known as "Linus Tech Tips," and they arrived there by clicking on the content creator's affiliate marketing link. Next, they added an item to their cart and proceeded to the checkout page.

42.     The extensions tab shows that the Capital One Shopping browser extension has been installed but has not yet been activated on the particular page. At this point, the _entry cookie correctly attributes the referral to "Linus Tech Tips," which is shown in Figure 2.



*Figure 2: The image above is a zoomed in version of Figure 1, which shows the affiliate marketing cookie value being displayed as "Linus Tech Tips," and thereby properly crediting him for the referral.*

43.     In this scenario, the content creator gets credit for the referral and should receive a commission from the eCommerce merchant if the consumer completes their purchase.

44.     However, as demonstrated in the images below, once the Capital One Shopping browser extension is activated, the _entry cookie—which would otherwise credit "Linus Tech Tips" with the sale and affiliate commission—is removed and replaced with Capital One's own affiliate marketing cookie.



*Figure 3: Capital One creates a pop-up banner on the shoppers' web browser even though it did not identify any coupons for the purchaser to use.*

45.    Capital One Shopping alters the checkout, and Linus Tech Tips' affiliate marketing cookie is removed and replaced with Capital One's own affiliate marketing cookie.



*Figure 4: Screenshot take after Capital One Shopping is activated.*

46.    In this scenario, Capital One gets credit for the referral and ultimate purchase of the product even though it did not help the consumer identify the product, nor did it provide the consumer with any additional discount for the product.

47.    Capital One Shopping thus steals credit for sales and pockets commission money it did not earn. Accordingly, Capital One's goal is to convince consumers to activate the Capital

One Shopping extension when making purchases, and this is true even when Capital One Shopping has not identified any relevant coupons based on the products in the consumer's cart.

48.     Stated differently, Capital One has designed its browser extension in a manner that requires consumers to actively engage with the browser extension—i.e. click buttons—in order to receive a discount, rewards, or cash back. These clicks are important to Capital One because, without them, the content creator in question will still be credited with the sale and receive any corresponding commission payment. Capital One only gets credit for the sale if they get the consumer to click on their pop-up.

49.     Capital One entices consumers to activate the Capital One Shopping browser extension in several different ways, each of which displaces the referring content creator and claims commission credit for sales that Capital One did not influence, much less generate.

50.     For example, consider a situation where Capital One Shopping has been installed on the user's website browser and the consumer clicks a content creator's marketing affiliate link and adds a product or service to their shopping cart. As the customer proceeds through the checkout process, Capital One Shopping creates a pop-up box alerting the user that it has identified a coupon, thereby enticing the user to click the "Try Codes" button.



*Figure 5: Capital One Shopping generates a pop-up during the online shopper's checkout.*

51.    If the consumer clicks the "Try Codes" button, Capital One Shopping discreetly opens a new tab that acts as a simulated referral click. This process removes the content creator's affiliate cookie and replaces it with Capital One's own affiliate marketing cookie.

52.    Thus, as a result of clicking the "Try Codes" button, Capital One is able to seamlessly and invisibly insert its own affiliate cookies, thereby stealing credit for the sale.

53.    As another example, where the same consumer follows an online content creator's marketing affiliate link to a gaming website, at checkout, Capital One Shopping generates a similar pop-up, but this time the shopper is presented with two options: "Try Codes" or "No Thanks, Activate Rewards." Like the "Try Codes" button, selecting the "No Thanks, Activate Rewards" button will also cause a simulated referral click. Thus, clicking either of the buttons shown in Figure 6 below will result in the content creator's affiliate cookies being replaced by Capital One's own affiliate marketing cookie.



*Figure 6: Screenshot taken during a consumer's checkout where Capital One Shopping presents the consumer with multiple options.*

54.     As yet another example, even where Capital One Shopping has not identified any coupons that apply to the purchase, as shown in Figure 7, Capital One Shopping still generates a pop-up to entice the consumer to activate the browser extension.



Figure 7: Screenshot taken during a user's checkout.

55.     Instead of providing a coupon, Capital One offers the consumer "up to 5% back" as part of the Capital One Shopping rewards program—a pseudo cash-back scheme where the consumer can redeem points for gift cards.

56.     If the consumer clicks the red "Activate" button, Capital One Shopping once again creates a simulated referral click that removes the content creator's affiliate cookies and invisibly credits Capital One with the referral and ultimate commission on the sale.

57.     In each of these examples, Capital One uses its browser extension to wrongfully steal commissions from their rightful owners.

**B.     Plaintiff's Experience**

58.     Shonna Coleman is an influencer and content creator who earns commission payments from affiliate marketing links she shares on social media, including Facebook (see, e.g., https://www.facebook.com/share/p/1HYMCVzoAc/, https://www.facebook.com/share/p/15XvJdJwmY/,

https://www.facebook.com/share/p/194HujNaX9/) and X (formerly known as Twitter) (@shonnacoleman).

59.    In past years, Ms. Coleman has received substantial commission payments from products purchased via her affiliate marketing links.

60.    Ms. Coleman would have earned more income in the form of commission payments but for Capital One's scheme to usurp commissions through the Capital One Shopping browser extension.

61.    Capital One, via the Capital One Shopping browser extension, stole credit for sales and conversions that Ms. Coleman originated via her own platforms, emanating from the affiliate marketing links she shared on those platforms.

**C.    How Class Members Were Harmed**

62.    Capital One's conduct harmed Plaintiff and the Class because the Capital One Shopping browser extension systematically steals commission payments from the rightful owners—*i.e.*, the individual who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

63.    Plaintiff promotes products via her social media channels and hosts affiliate marketing links to those products. She has several marketing affiliate links with Amazon.

64.    When one of Ms. Coleman's followers clicks on her affiliate marketing link and adds the product to their online shopping cart, her referral tag and cookie attaches and attributes the referral and sale of the product to Ms. Coleman, thereby crediting her with the sale and corresponding commission payment.

65.    However, if the consumer activates the Capital One Shopping browser extension during the checkout, Capital One Shopping wrongfully removes Ms. Coleman's affiliate cookie and replaces it with Capital One Shopping's own affiliate cookies, stealing credit for the referral and corresponding commission payment for that particular product.

66.    Ms. Coleman spends a substantial amount of time and money cultivating her follower-base and promoting the products featured in her affiliate marketing links.

67.     She relies on the stream of income she generates through her work as a content creator.

68.     The Capital One Shopping browser extension is activated during millions of online purchases each year. In the absence of the Capital One Shopping browser extension, Plaintiff and the Class would have earned more money in the form of referral fees and sales commissions from their respective affiliate marketing links.

69.     Plaintiff continues to devote time and energy to content creation to generate commissions.  Plaintiff accordingly faces future harm in the form of misappropriated referral fees and sales commissions because the Capital One Shopping browser extension continues to steal affiliate marketing commissions to this day.

## CLASS ALLEGATIONS

70.     Plaintiff, on behalf of herself and the class defined below under the Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seeks damages and injunctive relief:

> **Nationwide Class:** All persons in the United States who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Capital One as a result of the Capital One Shopping browser extension.

> **Nebraska Subclass:** All persons in Nebraska who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Capital One as a result of the Capital One Shopping browser extension.

> (together, "the Class").

71.     Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

72.     **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least

thousands of members of the Subclass, such that joinder of all Subclass members is likewise impracticable.

73.    **Typicality:** Plaintiff's claims are typical of the claims of the other class members. The factual and legal bases of Capital One's liability are the same and resulted in same type of injury to Plaintiff and all other members of the Class.

74.    **Adequate representation:** Plaintiff will represent and protect the interests of the Class both fairly and adequately. She has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interests that are antagonistic to those of the Class, and her interests do not conflict with the interests of the class members she seeks to represent.

75.    **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Capital One has acted on grounds generally applicable to the Class and because class members share a common injury. Common facts and legal questions apply to the claims of Plaintiff and class members because the injuries incurred by Plaintiff and each member of the Class arose from the same conduct alleged herein.

76.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a.    Whether Capital One programmed and designed the Capital One Shopping browser extension in a manner that wrongfully credits Capital One as the originator of sales referrals;

b.    Whether the scheme described herein results in Capital One being awarded commission payments it did not rightfully earn;

c.    Whether Capital One was unjustly enriched to the detriment of Plaintiff and the Class in the form of commission payments;

d.    Whether Capital One, through the actions alleged in this complaint, violated applicable consumer protection laws;

e.    Whether consumers and class members have been damaged by Capital One's conduct; and

f.  The nature and scope of appropriate injunctive relief.

77.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

78.     Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Capital One;

- The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- Capital One has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of class members consist of common issues whose resolution in a class trial would materially advance this litigation.

## TOLLING OF THE STATUTES OF LIMITATIONS

79.     All applicable statute(s) of limitations have been tolled by Capital One's knowing and active concealment and denial of the facts alleged herein. Plaintiff and class members could not have reasonably discovered Capital One's practice of surreptitiously manipulating network transmissions to allow Capital One Shopping to take credit for sales commissions it did not earn.

80.     Capital One was and remains under a continuing duty to disclose to Plaintiff and class members its practice of displacing content creators' tracking tags with its own tracking tags to appropriate commissions that belong to Plaintiff and class members. The active concealment by Capital One tolls any and all applicable statutes of limitations otherwise applicable to the allegations herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### UNJUST ENRICHMENT
#### (ON BEHALF OF THE CLASS)

81.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

82.     Plaintiff lacks an adequate remedy at law.

83.     Plaintiff and class members have an interest, both equitable and legal, in the referral fees and commission payments to which they were wrongfully deprived. These payments were rightfully earned by Plaintiff and class members, not Capital One.

84.     Capital One benefitted from the referral fees and commission payments that were credited to it as a function of the Capital One Shopping browser extension wrongfully claiming credit via last-click attribution.

85.     Capital One understood that it so benefitted, and it also understood and appreciated that the Capital One Shopping browser extension would cause the harm described herein.

86.     But for Capital One's unjust and improper use of the Capital One Shopping browser extension, it would not have been credited and awarded commission on sales that emanated from Plaintiff's and class members' respective affiliate marketing links.

87.     As a result of Capital One's wrongful conduct as alleged in this Complaint, Capital One has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and class members.

88.     Capital One continues to benefit and profit from the Capital One Shopping browser extension while Plaintiff and class members continue to have their rightful commission payments diverted to Capital One.

89.     Capital One's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including by using the Capital One Shopping browser extension to wrongfully credit itself with referrals and commissions it did not rightfully earn.

90.     The benefit conferred upon, received, and enjoyed by Capital One was not conferred officiously or gratuitously, and it would be inequitable and unjust for Capital One to retain the benefit.

91.     Equity and good conscience militate against permitting Capital One to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiff and class members.

## SECOND CAUSE OF ACTION
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (ON BEHALF OF THE CLASS)

92.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

93.     Plaintiff and class members are engaged in an economic relationship with eCommerce merchants by referring their audiences to those merchants through affiliate links. In return, eCommerce merchants provide Plaintiff and class members with referral fees or commissions. This economic relationship is ongoing, and Plaintiff and class members expect to continue earning commissions in exchange for referrals.

94.     Capital One is aware of the referral and commission relationship between Plaintiff and class members on the one hand and eCommerce merchants on the other hand.

95.     Through use of the Capital One Shopping browser extension, Capital One diverts commission payments from Plaintiff and class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an eCommerce merchant's product or service. Capital One, via the Capital One Shopping browser extension, displaces tracking tags that point to specific content creators as the source of the referral, and substitutes its own tracking tags, even though the sales in question emanated from a content creator's affiliate marketing link.

96.     Capital One either intended to usurp commissions from Plaintiff and class members through the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees from Plaintiff and class members.

97.     Capital One's conduct harmed Plaintiff and class members because the Capital One Shopping browser extension deprived them of monies they earned as the true originators of sales arising from their affiliate marketing links.

98.     As a direct and proximate result of Capital One's conduct described in this Complaint, Plaintiff and class members suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

99.     As a result of the above conduct, Capital One is liable to Plaintiff and class members for damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### CONVERSION
### (ON BEHALF OF THE CLASS)

100.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

101.     Plaintiff and class members possessed or had a right to possess commissions they earned from referring consumers to products and services sold by eCommerce merchants. The amount of each commission constituted a specific and identifiable sum.

102.     Capital One intentionally and substantially interfered with Plaintiff's and class members' personal property by usurping commissions and referral fees owed to Plaintiff and class members.

103.     Capital One, without proper authorization, assumed and exercised the right of ownership over these commissions, in hostility to the rights of Plaintiff and class members, without justification.

104.     Capital One's wrongful exercise of control over Plaintiff's and class members' personal property constitutes conversion.

105.     Plaintiff and class members neither assented to nor ratified Capital One's interference with their commissions.

106. As a direct and proximate result of Capital One's conversion, Plaintiff and class members were harmed.

107. Capital One is liable to Plaintiff and the Class for damages and costs permitted by law.

### FOURTH CAUSE OF ACTION
### VIOLATION OF NEBRASKA'S UNIFORM DECEPTIVE
### TRADE PRACTICES ACT (UDTPA)
### NEB. REV. STAT. §§ 87-301, ET. SEQ.
### (ON BEHALF OF THE NEBRASKA SUBCLASS)

108. Plaintiff incorporates the above allegations by reference as if fully set forth herein.

109. Nebraska's UDPTA makes it unlawful to engage in deceptive trade practices.

110. Capital One violated Nebraska's UDPTA through its conduct as alleged herein. In particular, Capital One's conduct constitutes a violation of Sections 87-302(a)(2), (a)(3), (a)(5), (a)(6), (a)(12), and (a)(16).

111. Capital One is liable to Plaintiff and the Nebraska Subclass for damages, costs and injunctive relief as permitted by law.

### FIFTH CAUSE OF ACTION
### VIOLATION OF NEBRASKA CONSUMER PROTECTION ACT (NCPA)
### NEB. REV. STAT. §§ 59-1602, ET. SEQ.
### (ON BEHALF OF THE NEBRASKA SUBCLASS)

112. Plaintiff incorporates the above allegations by reference as if fully set forth herein.

113. The NCPA provides, in relevant part, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

114. Capital One violated the NCPA through its conduct as alleged herein.

115. Capital One's conduct affected the public interest because it was widespread. Affiliate marketing links are ubiquitous, as is Capital One Shopping.

116. Capital One is liable to Plaintiff and the Nebraska Subclass for damages, costs, and injunctive relief as permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

A.      Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

B.      Enter judgment in favor of Plaintiff and the Class;

C.      Enter injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class, including to prevent the Capital One Shopping browser extension from taking credit for sales it did not originate;

D.      Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and restitution to which Plaintiff and the Class are entitled;

E.      Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.      Award Plaintiff and the Class pre- and post-judgment interest as provided by law;

G.      Enter such other orders as may be necessary to restore to Plaintiff and the Class any money and property acquired by Capital One through its wrongful conduct;

H.      Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees as permitted by law; and

I.      Award such other and further relief as the Court deems necessary and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.


DATED: January 13, 2025                    Respectfully submitted,

                                           By: /s/ Lee A. Floyd
                                           Lee A. Floyd
                                           BREIT BINIAZAN
                                           2100 East Cary Street, Suite 310
                                           Richmond, Virginia 23223
                                           (804) 351-9040
                                           lee@bbtrial.com


                                           E. Michelle Drake*
                                           emdrake@bm.net
                                           Marika K. O'Connor Grant*
                                           moconnorgrant@bm.net
                                           BERGER MONTAGUE PC
                                           1229 Tyler Street NE, Suite 205
                                           Minneapolis, MN 55413
                                           T. 612.594.5999; F. 612.584.4470

                                           Sophia M. Rios*
                                           srios@bm.net
                                           BERGER MONTAGUE PC
                                           8241 La Mesa Blvd., Suite A
                                           La Mesa, CA 91942
                                           T. 619.489.0300

                                           *pro hac vice forthcoming
                                           Attorneys for Plaintiff